IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 6, 2007

## STATE OF TENNESSEE v. ADRIAN PORTERFIELD

**Appeal from the Criminal Court for Shelby County**
**No. 02-02442      Fred W. Axley, Judge**

_____

**No. W2006-00169-CCA-R3-CD   -   Filed October 15, 2007**

_____

The defendant, Adrian Porterfield, was convicted by a Shelby County jury of voluntary manslaughter, a Class C felony, and was sentenced to serve four years and six months in the county workhouse as a Range I, standard offender.  On appeal, the defendant challenges the trial court's judgment on grounds that: (1) the evidence was insufficient to support his conviction; (2) the trial court erred in denying his motion to sever his trial from that of his co-defendant; (3) the trial court erred in admitting a hearsay statement by the victim; (4) the trial court erred in not allowing evidence of drugs found on the victim's body; (5) the trial court erred in not allowing testimony of a statement the victim made to police regarding his involvement in a robbery of the defendant; (6) the trial court erred in denying alternative sentencing; and (7) the length of his sentence is excessive.  We affirm the trial court but remand the case for a corrected judgment because the sentence imposed in the judgment conflicts with the sentence reflected in the sentencing hearing transcript.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed; Case Remanded for Correction of Judgment**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

Leslie I. Ballin and Gray W. Bartlett, Memphis, Tennessee, for the appellant, Adrian Porterfield.

Robert E. Cooper, Jr., Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Glen C. Baity, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arose from the death of Darryl Clay on October 26, 2001.  The defendant was indicted for second degree murder, along with Eric Johnson, who was also charged with two counts of reckless endangerment.  At their joint trial, the victim's former girlfriend, Shauna Parham, testified that she was living with the victim at a residence on Overton Crossing in Shelby County at

the time of the victim's death. She said that on the evening of October 26, 2001, she was at home with her three children, the victim, the victim's nephew Demarcus Brown, and Felicia Jackson. She said that at around 10:00 p.m., the victim and Mr. Brown left the house and that she understood that they were going to the store. She said that was the last time she saw the victim alive. At some point that evening, she was summoned to the Mapco store about a block away from her house by two individuals who said the victim wanted to see her. She said she went to Mapco but that by the time she got there, the victim was in an ambulance.

Ms. Parham identified photographs of a gunshot hole, which she said she discovered in her twelve-year old son's bedroom in the morning of October 27, 2001. She said that at some point in the evening of October 26, she was sitting in the den of her house, while her son was in his bedroom, when she heard a noise that she described as "like a bell sound." She said she did not own a weapon. Ms. Parham denied that she, Brown, or the victim was drinking on the evening of October 26. She acknowledged that the victim was arrested on August 21, 2001, for aggravated robbery and that she helped him make bond on September 4, 2001, but she said she had no knowledge of the underlying facts of that charge. She said the victim was known by the nickname "Barnyard."

Sergeant Timothy Green of the Memphis Police Department testified that he was working in the department's robbery bureau in August 2001. He said he investigated a robbery during that time that involved the defendant as a victim and Darryl Clay as the suspect. It was alleged in that case that the defendant and two other men were in an apartment on Overton Crossing in the early morning of August 21, 2001, when the victim, wielding a pistol, forcefully entered and demanded money. Sergeant Green said he spoke with the defendant during his investigation of that case. Sergeant Green said the defendant stated that he was going to kill the person who robbed him. Sergeant Green also testified that he believed the defendant also said he was afraid Darryl Clay was going to kill him.

Demarcus Brown testified that he was with the victim, his uncle, on the evening of October 26, 2001. He said that they were together at the victim's house with Ms. Parham, Ms. Parham's children, and Felicia Jackson. At some point in the evening, Mr. Brown and the victim left the house to visit someone named Ms. Jean and her son, Rufus, who lived in the Willows apartments on Overton Crossing. After visiting and playing cards, Mr. Brown and the victim walked to the Mapco across the street from the apartments to buy cigarettes for Rufus. They returned to Ms. Jean's apartment, and Ms. Jean gave the victim a plate of food. Mr. Brown said he and the victim left the apartment and were walking toward the parking lot when they were stopped by a car full of women who were looking for someone called "Pops," who was a resident at the apartments. He said that while they were talking to the women, Eric Johnson, carrying a gun, "bumped" him while "talking smart under his breath." He said that he told the victim about Johnson's carrying a gun and that Johnson continued walking away from them. He said he then looked back to see the defendant exiting from a gold car. He said the defendant walked toward the victim, who was walking away toward the corner of the nearest apartment building. He said that as the victim turned the corner, he saw the defendant shooting a gun in the victim's direction. He said he could not see the victim while

the defendant was shooting because the victim had turned the corner toward the apartment courtyard. Mr. Brown said he first stood still but later ran to an adjacent apartment building.

Mr. Brown testified that the victim was not carrying a weapon that night. He also denied that either he or the victim used marijuana or drank alcohol that night. He said the victim did not appear to be intoxicated. He said that he could not remember what the victim was wearing that night and that he did not know how many shots were fired. He did not know exactly what time the shooting occurred, but he knew it was some time between 10:00 p.m. and midnight. He also testified that he did not actually see the victim running, although in a previous statement, he said the victim was running away from the defendant. He said that the victim was carrying a plate of food when they were walking outside together but that he did not see the victim drop the plate.

Mark Taylor testified that in October 2001, he lived in the Willows apartments and that he was a friend of the victim. Mr. Taylor's apartment was on the ground level, across a courtyard from Pops' apartment, which was also on the ground level. Between their two apartments was a stairwell that led to the higher floors of each apartment building. He said he was at home in the shower on the night of October 26, 2001, when he heard a gunshot. He said he rushed out of the shower without getting dressed, looked out a window, and saw the defendant and the victim "scuffling" at the front door of Pops' apartment. He said they wrestled for about two or three minutes, until the victim broke away, ran inside Pops' apartment, and shut the door. Mr. Taylor said Eric Johnson appeared and assisted the defendant in trying to push the door open. He said the victim ran out of the back door of the apartment and was followed by the defendant and Johnson. He said he then heard three more gunshots and saw the defendant and Johnson firing guns. He said he got dressed and went to the Mapco, which was across the street from the apartments. There, he saw the victim sitting against some drinks.

On cross-examination, Mr. Taylor was questioned about two written statements he gave to police about this incident, one in the early morning of October 27 and another in the afternoon of October 28. He acknowledged that the statements mention nothing about the victim or the defendant's entering Pops' apartment. He also acknowledged that his statement of October 27 stated that he heard a gunshot while the victim and defendant were scuffling, but he denied that he actually said that and maintained in his testimony that he did not hear a gunshot at that time. He said that when he was looking out the window to where the victim and defendant were scuffling, he was not wearing his glasses. He acknowledged that he said in a prior statement to police that he could not read or write without his glasses, but he testified that he could see well without his glasses, as long as the area was well-lit. He said that he had a direct view of the victim and defendant when they were in front of Pops' apartment and that his view was not obstructed by the stairwell. He said that when he heard the three gunshots, the victim was running away from the defendant and Johnson with his back toward them. He said he did not know what kind of gun the defendant was shooting, although he opined that it was a nickel-coated .380 or 9 mm. He acknowledged that in a previous statement, he said the gun was a silver .45. He said he was certain he saw the defendant and Johnson shooting at the victim.

Memphis Police Department Officer Kenneth Frazier testified that on October 26, 2001, he was on his way to work the midnight shift when he stopped at the Mapco near Overton Crossing. He said he was getting coffee when the victim came in and said he had been shot. He said the victim was "very excited and screaming and hollering." Officer Frazier asked the victim what happened, and the victim replied that "Porterfield had rode up on him in a car and shot him." Officer Frazier said that at the time, he didn't know who Porterfield was. He said that the victim was bleeding and that he saw wounds on the victim's side, his arm, and his leg.

Memphis Police Department Officer Daniel Parris testified that he was a crime scene officer working the midnight shift on October 26, 2001. He said he was called to the scene of a possible homicide at a Mapco store that night. In the store, he found a white shirt and some blood on the floor. He said he was told to go to a house on Overton Crossing that was down the street from the store, where he took photographs of what appeared to be a bullet hole in the front of a house. Officer Parris also recovered a spent bullet from the house. He did not recall whether he went to the scene where the shooting of the victim took place, and he did not remember taking photographs of any doors at an apartment complex.

Lieutenant Anthony Craig of the Memphis Police Department testified that he was assigned to investigate the victim's homicide. He said that his investigation developed two suspects, the defendant and co-defendant Johnson. He said he spoke to Johnson on October 30, 2001, while Johnson was in custody, and obtained consent to search Johnson's house. He said that officers found a .45 Smith & Wesson handgun and a magazine clip with several live rounds in Johnson's house and that Johnson acknowledged they belonged to him. In his statement to Lieutenant Craig, Johnson said he shot at the victim in self-defense. Johnson said that on the evening of October 26, 2001, he, the defendant, and a friend named Marlo attended a party and that he and the defendant were later dropped off on Cassie Avenue, from where they intended to meet a friend named Wayne at the apartments on Overton Crossing. He said they had stopped to urinate when he saw the victim coming out of the apartment complex with a gun. Johnson said the victim raised his gun at the defendant. Johnson said he tried to shoot first but was unable to because he did not have his clip in his gun. He said that the victim fired the first shot and that while Johnson was putting his clip in his gun, four or five more shots were fired. He said that after he got the clip in the gun, he turned around and shot his gun once "out of fear." He said that he ran away and that he saw a person carrying a gun by the victim's house. Johnson said he shot at the person. He said he stayed on Cassie Avenue until about 1:00 or 1:30 a.m. before going home. In his statement, Johnson said that he heard the defendant fire his pistol but that he did not know whether the victim or the defendant fired more shots after the victim fired the first shot. Lieutenant Craig said Johnson had always maintained that he shot at the victim in self-defense.

Tennessee Bureau of Investigation Special Agent Don Carman testified that he was a forensic scientist who examined evidence related to the victim's homicide. He examined a .45 Smith & Wesson handgun and a spent bullet casing. He determined that the bullet was .357 caliber and that it likely came from a revolver, either a .38 special or a .357 magnum revolver. He was of the opinion

that it was not fired from the .45 handgun he examined. He said he did not receive a bullet shell casing that matched the .45 handgun.

Dr. Kenneth Snell testified as an expert in the field of forensic pathology. He said he began working for the Medical Examiner's office in October 2004 and that he reviewed reports and photographs related to the autopsy of the victim's body that was performed by another doctor on October 27, 2001. Dr. Snell described the victim's three gunshot wounds. The first wound was from a bullet that entered the back of the victim's right shoulder and right chest cavity, causing damage to the right lung and heart. The bullet was recovered from this wound. The second was from a bullet that entered the back of the victim's right forearm and exited to the left of the entry wound, also in the back of the arm. The third was from a bullet that entered the victim's inner thigh from the front and which exited from the back. No bullets were recovered from the arm and leg wounds. Dr. Snell said the cause of death was the gunshot wound to the shoulder/chest area. He said the other two wounds were not fatal.

Regarding the direction from which the victim was shot, Dr. Snell testified that he only knew the pathway of the projectiles and not the position of the victim at the time he was shot. He said that it was possible the victim was facing away from his shooter but that it was equally likely the victim and shooter were facing each other. He said the toxicology report indicated the victim had a blood alcohol content of .096. The toxicology report did not indicate drugs in the victim's system. The autopsy report also noted several preexisting scars on the victim's body and a blunt force injury to the back of the victim's head. Dr. Snell said he was unable to determine how the head injury occurred.

Dr. Snell testified that gunshot residue tests are sometimes done on autopsy subjects to determine whether someone had shot a gun. He said bodies sometimes come in with their "hands tagged," meaning that law enforcement personnel had placed paper bags over their hands to prevent gunshot residue from being wiped or washed away before a gunshot residue test is performed. He said that a gunshot residue test was not performed on the victim and that the victim's hands had not been tagged.

The defendant testified that in August 2001, he did not know the victim but had seen him around the Willows apartments, where the defendant lived at the time. He said that on August 21, 2001, he was in his apartment with his cousin and his cousin's girlfriend when the victim kicked down the door and entered with two guns and a bullet-proof vest. He said that the victim demanded money at gunpoint and that he gave the victim money out of fear for his life. He said the victim then backed out the apartment door and down the walkway. The defendant said he left his apartment while the victim was still standing nearby and went to the Mapco across the street. He said he heard two gunshots and walked to his mother's house. He said he reported the robbery to the police and told the police he was afraid of the victim, but he denied ever saying he was going to kill the victim.

The defendant testified that the next time he saw the victim after the robbery was in early September 2001. He said he was surprised the victim was released from jail so soon. He said that

he was worried because he knew the victim lived in his neighborhood and that he told Officer Green on three occasions that he was afraid of the victim. He said he saw the victim on another occasion carrying a shotgun. He said he received several threats that the victim was going to kill him. He said he received the last threat on October 25, 2001. He said that because of the death threats and feeling that he needed to protect himself, he began carrying a gun.

The defendant described what transpired on the evening of October 26, 2001. He said that he met co-defendant Johnson after Johnson got off work in the evening and that they went to a party. He said they left the party to pick up a friend who lived in the Willows apartments. He said that another friend, A.J., was driving and that after they pulled into the Willows' parking lot, the defendant and Johnson left the car and walked around the corner of the apartments to urinate. He said that he finished before Johnson and that while waiting for Johnson to finish, he heard the victim say, "I told you I was going to get [your] a--." He said he saw the victim walking toward him, alone, holding a plate of food, which he dropped. He said the victim lifted a pistol and fired a shot. The defendant said he pulled out his gun, shot, and ran in the direction opposite the victim. He estimated that he fired a total of two or three shots while he ran away. He said that he was not hit and that he did not know whether the victim was hit. He said he also did not know whether Johnson ever fired his gun. He said he ran back to A.J.'s car and went to his mother's house. He said he was arrested on January 20, 2003. The defendant maintained that he only shot at the victim after the victim fired the first shot and because he thought the victim was going to kill him.

On cross-examination, the defendant said he did not report the death threats to the police because he had already told them he was afraid of the victim. He said he did not call the police when he first saw the victim carrying a shotgun because the victim did not attack him or even see him at that time. He said he was aware that the victim lived in the same neighborhood and frequented the Willows apartments. He said he was not sure what caliber gun he had but knew it was a small revolver. He said he had never owned a gun before. He said he knew Johnson had a permit to carry a gun. The defendant denied Demarcus Brown's and Mark Taylor's version of events and said he never wrestled with the victim. He denied that he killed the victim out of revenge.

Memphis Police Department Officer Winston White testified that on August 21, 2001, he went to an apartment to arrest the victim in connection with an alleged robbery. He said he arrested the victim and searched the apartment, finding two weapons, a bullet-proof vest, and $190 in cash. A lady and another man were also in the apartment.

At the conclusion of the evidence and arguments, the defendant was found guilty of the lesser included offense of voluntary manslaughter. Co-defendant Johnson was acquitted of charges related to the death of the victim but was convicted of two counts of reckless endangerment related to gunshots fired at Ms. Parham's house.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was not sufficient to support his conviction for voluntary manslaughter. He argues that the evidence preponderates against guilt and that no evidence to rebut the claim of self-defense existed. The state contends that the evidence was sufficient.

Our standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence; rather, we presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

The defendant was charged with second degree murder, which is the unlawful, knowing killing of another. T.C.A. § 39-13-201, -210. He was convicted of voluntary manslaughter, which requires "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." T.C.A. § 39-13-211. The state presented evidence at trial that the defendant, who had previously said he wanted to kill the victim, approached the unarmed victim, began shooting at him, and wrestled with him before the victim ultimately died of a gunshot wound. The defendant presented contrary evidence that the victim had previously threatened to kill the defendant, that the victim fired the first shot, and that the defendant only fired back in self-defense. Our code states that a person who has reasonable fear of imminent danger, death, or serious bodily injury is justified in using force in self-defense to the degree necessary to protect against the other person's use of unlawful force. T.C.A. § 39-11-611.

In convicting the defendant of the lesser included offense of voluntary manslaughter, the jury apparently adopted a version of events that combined the state's and defendant's proof–that the defendant shot the victim under provocation but that the defendant was not justified in using deadly force. We conclude that sufficient evidence exists for this conviction. It is true that the state has the burden of proving that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001). However, the issue of whether the defendant was justified in using self-defense is a question of fact for the jury. State v. Clifton, 880 S.W.2d 737, 742 (Tenn. Crim. App. 1994). In this case, the jury heard testimony from the defendant that he acted out of fear for his life and apparently rejected this defense. It is not the province of this court to second-guess factual determinations made by the jury. We conclude that the evidence was sufficient to convict the defendant of voluntary manslaughter.

## II. SEVERANCE

The defendant contends that the trial court erred in denying his motion to sever his trial from that of his co-defendant, Eric Johnson. He asserts that the jury was incapable of distinguishing between the evidence presented against each defendant and that the defendant was not afforded a fair determination of his guilt or innocence. The state counters that the defendant was not entitled to a severance and that the trial court did not abuse its discretion in denying a severance.

Tennessee Rule of Criminal Procedure 8(c) allows for the joinder of multiple defendants in a single indictment if the offenses charged "were part of a common scheme or plan" or "were so closely connected in time, place, and occasion that it would be difficult to separate proof of one charge from proof of the other." Tenn. R. Crim. P. 8(c)(3). A defendant is entitled to a severance of trial if "the court finds a severance . . . appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(A). Whether to grant a severance, however, is within the discretion of the trial court. State v. Meeks, 867 S.W.2d 361, 369 (Tenn. Crim. App. 1993) (citing State v. Coleman, 619 S.W.2d 112, 116 (Tenn. 1981)).

The charges against the defendant and Johnson were connected in time, place, and occasion, and involved many of the same facts. The defendant has not shown how he was prejudiced by being tried with Johnson but only makes unsupported assertions that he "suffered prejudice by being tried with Eric Johnson" and that the "convoluted nature of the evidence . . . was such that the fact-finder was incapable of distinguishing between the evidence presented against each defendant." The defendant has not pointed to specific pieces of evidence introduced against Johnson that prejudiced him. We disagree with the defendant that the evidence presented at trial was of a "convoluted" nature so as to prevent a fair determination of the defendant's guilt or innocence and require separate trials. We conclude that the defendant has not demonstrated that he was prejudiced by the denial of his motion for severance and that the trial court did not abuse its discretion in denying severance.

## III. ADMISSIBILITY OF EVIDENCE

### A. Victim's Excited Utterance

During trial, while Officer Frazier was testifying about encountering the victim at Mapco, the following colloquy occurred:

> [Officer Frazier]: I was standing in there getting me some coffee and a gentleman known to me as Barnyard came in there and said he had been shot. And when I asked him who shot him - -
>
> [Defense counsel]: Judge, at this point in time, I object. There has not been a proper foundation.

| [Prosecutor]: | State's going to lay it, Judge. We'll lay the foundation. |
|---|---|
| [Court]: | Okay. Objection sustained. |
| [Prosecutor]: | When you saw Mr. Clay also known as Barnyard, come in, what was his emotional state? |
| [Officer Frazier]: | He was very excited. He was very excited and screaming and hollering. |
| [Prosecutor]: | Did you notice anything unusual about him? |
| [Officer Frazier]: | He was bleeding. |
| .... | |
| [Prosecutor]: | Did he - - did he make any statements to you - - |
| [Officer Frazier]: | I asked him - - |
| [Prosecutor]: | - - about the shooting? |
| [Officer Frazier]: | Yes. I asked him what had happened and he said that Barnyard - - correction, Porterfield had rode up on him in a car and shot him. |

The defendant contends that the trial court erroneously allowed the victim's hearsay statement about being shot by the defendant under the excited utterance exception to the hearsay rule. See Tenn. R. Evid. 803(2). He argues that because the state never established the time that elapsed between when the victim was shot and when he made the statement to Officer Frazier, the statement could not qualify as an excited utterance. We disagree.

Three requirements must be met for a hearsay statement to be admissible as an excited utterance: (1) there must be a startling event or condition; (2) the statement must relate to the startling event or condition; and (3) the statement must be made while the declarant is under the stress or excitement from the event or condition. Tenn. R. Evid. 803(2); State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). The "ultimate test" for determining the admissibility of an excited utterance is "spontaneity and logical relation to the main event and where an act or declaration springs out of the transaction while the parties are still laboring under the excitement and strain of the circumstances and at a time so near it as to preclude the idea of deliberation and fabrication."

-9-

State v. Smith, 857 S.W.2d 1, 9 (Tenn. 1993). Other relevant considerations include: (1) the time interval between the startling event and the statement; (2) the nature and seriousness of the condition; (3) the appearance, behavior, outlook, and the circumstances of the declarant, including characteristics such as age, physical condition, and mental condition; and (4) the contents of the statement, which may indicate the presence or absence of stress. Gordon, 952 S.W.2d at 820. The rationale behind the excited utterance exception is that the hearsay statement is reliable because it is made when time for reflection and possible fabrication are lacking and memory of the event is still fresh in the declarant's mind. Id. at 819-20 (citing Neil P. Cohen et al., Tennessee Law of Evidence, § 803(2).1, at 532 (3d ed. 1995)).

The hearsay statement by the victim and repeated by Officer Frazier was related to the startling event of the victim's being shot. The only issue that the defendant raises regarding its admissibility is that the state did not establish the time interval between when the victim was shot and when he made the statement. While it is true that the state never presented evidence that quantified this time interval, the record establishes that the victim's statement was very near to the time that he was shot and, more importantly, that the victim spoke while under the excitement of his being shot. Evidence showed that the victim was shot at some time in the late evening of October 26 while running away from the Willows apartments and toward the Mapco across the street from the apartments. Officer Frazier encountered the victim shortly before midnight while at the Mapco and while the victim's gunshot wounds were fresh. Officer Frazier testified that the victim "was very excited and screaming and hollering." The victim's statement meets all the requirements of an excited utterance. The defendant's contention that this evidence was improperly admitted is without merit.

## B. Drugs Found on Victim

Prior to trial, the trial court granted the state's motion in limine to suppress evidence of marijuana and cocaine found on the victim's body at the hospital where he died. The trial court agreed with the state that this evidence was not relevant. The defendant contests this ruling, arguing on appeal that "the presence of drugs on the deceased's body was relevant to portray a fair and accurate account for the trier of fact."

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Under Tennessee Rule of Evidence 402, irrelevant evidence is not admissible. Relevant evidence is generally admissible but may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. See id. 402, 403. A trial court's evidentiary ruling based on relevance is reviewed on appeal for an abuse of discretion. See State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).

We conclude that the trial court did not abuse its discretion in granting the state's motion to exclude evidence of drugs found on the victim. The victim's possession of drugs had no bearing on any fact that was consequential to the determination of the defendant's guilt or innocence. The

defendant has not explained how the evidence he sought to admit would have benefitted his defense. A toxicology report was entered into evidence which showed that the victim had alcohol, but not drugs, in his system at the time of his death. Therefore, evidence that the victim was in possession of marijuana and cocaine would not have proved that his actions the night of his death were impaired by drug use. The defendant did not assert in his defense that the confrontation between him and the victim on the night of the victim's death was related to drugs or that drugs were otherwise involved in the events that led to the victim's death. Thus, there is no merit to the defendant's argument that evidence of the victim's possession of drugs "was relevant to portray a fair and accurate account" for the jury.

### C. Victim's Statement Regarding Robbery

The state filed a pre-trial motion in limine to exclude evidence of the statement the victim gave to police following his alleged aggravated robbery of the defendant and two others. The victim gave the following statement to Sergeant Green regarding the incident:

> On this night Cory, Adrian and Kumba was in the house gambling, I asked them if they had some work. They said [yes]! Then Cory didn't want to go outside so he sent Kumba. And at that time [K]umba was walking [from] the house to the car with the pistol. He opened the door reached over the sun visor and handed me the dope and I paid him $50.00 for the dope. I left got it tested by one of those junkies and I could see the baking soda on it. The junkie came back to me about five minutes [later] and said that the dope was no good. I gave her back her ten dollars and I tasted it and you could taste the baking soda. Then I went back to Cory's apartment and I told them that I wanted my money back and Cory and Adrian said No, It was nothing wrong with the dope we've been selling it all day. Then, Kumba came outside with the pistol to give me my money back, but at the same time he was doing a lot of jacking. He said the [sic] time your not going to get your money back. I said y'all can't be around here selling whap dope then Kumba said, "Man it is good dope you can't make me say its not good dope. Then he started [to] bring the gun up and I caught it and he fired it twice. I took the gun from him and he ran to the apartment where Cory and Adrian was. I followed him, because I was trying to get my money back. I walked up to the door it was still open I went in and asked Kumba, Cory and Adrian where is my money, this man (Kumba) don't sell dope where is my money. Then Adrian and Cory started yelling and throwing me money. I took the money left then I told them that [they] need to stop selling that fake dope. Then I went over my friend's house and that's where the police came and arrested me. The police went in the

-11-

> apartment where Cory and Adrian was and they didn't find any other
> drugs or the other guns they had in the apartment.

Before the trial began, defense counsel told the court that it did not intend to use this statement. However, during Sergeant Green's testimony, defense counsel tried to elicit the statement, wanting evidence that the victim admitted to robbing the defendant, and argued that it was admissible as a "statement against interest." See Tenn. R. Evid. 804(b)(3). The trial court disagreed and ruled the evidence inadmissible. The defendant argues on appeal that this decision was in error.

Tennessee Rule of Evidence 804 allows for certain types of hearsay statements to be admitted into evidence when the declarant is unavailable to testify in court. See Tenn. R. Evid. 804(a) (defining "unavailability"). One such exception is a "statement against interest," which is defined as a "statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Id. 804(b)(3). The "cornerstone" to this exception is that

> a reasonable person similarly situated to the declarant would not have
> made the statement unless the reasonable person believed it was true.
> In turn, this statement means that a reasonable declarant would have
> realized it was against his or her interest. The important time is when
> the statement was made.
>
> Rule 804(b)(3) does not specifically provide that the declarant
> must have personally known that the statement was against his or her
> interests when it was made. However, this knowledge is the reason
> a hearsay statement is viewed as sufficiently reliable to be admitted,
> and the evidence should not be admitted if it is established that the
> declarant did not know that the statement was harmful. For example,
> if the declarant actually believed that he or she was saying something
> that would be helpful, reliability is questionable and the statement
> should not be admitted under this hearsay exception.

Neil P. Cohen et al., Tennessee Law of Evidence, § 8.36[5], at 8-161 (5th ed. 2005). Thus, our courts have held that a hearsay statement can only be admitted if the circumstances surrounding the statement are such that the statement is sufficiently reliable. See State v. Louis Bernard Williams, No. W2005-01405-CCA-R3-CD, Madison County, slip op. at 6 (Tenn. Crim. App. June 30, 2006); State v. Christopher Kevan Hein, No. E2003-01793-CCA-R3-CD, Knox County, slip op. at 7-8 (Tenn. Crim. App. June 9, 2004).

The victim's statement could have subjected the victim to criminal liability in that he admitted he asked for money while holding a pistol and attempted to buy drugs. At the same time,

the victim gave the statement in response to questions about his involvement in an aggravated robbery, and he stated that he only took control of the pistol after it was first directed at him by one of the alleged robbery victims and that he only intended to retrieve money that he believed was owed to him. Thus, his statement could be read as both an admission of criminal behavior and as an attempt to limit his liability for the crime for which he was arrested.

Under either position, though, we conclude that exclusion of the evidence was harmless. The defendant has not explained how he was prejudiced by the exclusion of the evidence or that exclusion more probably than not affected the result of the trial. See T.R.A.P. 36(b); Tenn. R. Crim. P. 52(a). The jury heard evidence that the victim was arrested for an armed robbery allegedly perpetrated against the defendant and others and that the victim had threatened the defendant on occasion. The jury convicted the defendant of the lesser included offense of voluntary manslaughter. We do not see how the admission of the victim's statements regarding the robbery would have affected this result. Therefore, the defendant is not entitled to relief on this issue.

### III. SENTENCING

At his sentencing hearing, the defendant testified that he was twenty-nine years old with five children and that he lived with his wife. He said he dropped out of high school in 1995 to work but that he received his GED shortly thereafter. He said he was a member of the carpenter's union and that he was working for a cleaning service. He said he had worked in carpentry on and off since 1997, when he began taking classes at a work force development program at Tennessee Tech University. He said he was not raised in an environment where crime was a way of life and that he did not plan on raising his children in such an environment. He said he could live the life of a good citizen and remain drug-free. He said he regretted that the victim lost his life but maintained that he acted in self-defense. On cross-examination, the defendant acknowledged that although he said he had several jobs in the past few years, his presentence report only reflected two of them. The presentence report also reflects that although the defendant was arrested twice on drug-related charges, both cases were dismissed and that he had no prior criminal convictions.

The victim's sister, Kimnetta Smith, testified about how the victim's death had affected her family. She said the victim's son was eleven years old when the victim was killed and did not understand why his father died. She said the victim's death and the resulting homicide case had caused the victim's family much hurt, anger, and pain. She noted that the defendant never apologized for his actions. On behalf of the victim's family, she asked the court to give the defendant the maximum sentence without early release or probation.

At the conclusion of the sentencing hearing, the court stated that it would deny probation and would sentence the defendant to four years and six months in the county workhouse. The judgment form reflects that the defendant was sentenced to four years. On appeal, the defendant contends that the trial court erred in determining both the manner and length of the sentence.

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d) (2003).[1] As the Sentencing Commission Comments to this section note, the burden is on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if we would prefer a different result. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this regard, for the purpose of meaningful appellate review,

> [T]he trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

In conducting our de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229, 236-37 (Tenn. 1986).

## A. Denial of Alternative Sentencing

The defendant contends that the court erred in denying him alternative sentencing. Our Code instructs that when determining if confinement is appropriate, a trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct; (2) confinement is necessary to avoid depreciating the seriousness of the offense, or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses; or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. T.C.A. § 40-35-103(1)(A)-(C). The trial court should also

---

[1] We note that on June 7, 2005, the General Assembly amended Tennessee Code Annotated sections 40-35-102(6), -114, -210, -401. See 2005 Tenn. Pub. Acts ch. 353, §§ 1, 5, 6, 8. However, the amended code sections are inapplicable to the defendant's appeal.

consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 and -114. T.C.A. §§ 40-35-103(5), -210(b)(5) (2003); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). The sentence imposed should be the least severe measure necessary to achieve its purpose. T.C.A. § 40-35-103(4). As a standard offender of a Class C felony, the defendant is presumed a favorable candidate for alternative sentencing. T.C.A. § 40-35-102.

In denying the defendant probation, the trial court stated the following:

> I do not believe that you would serve well on probation. I'm concerned about it. I noted some attitude in your testifying. I've considered the presentence report, your physical and mental condition, social history, facts and circumstances surrounding the offense, the nature and circumstances of your criminal conduct involved, prior criminal history. You don't have much. So there's a lack thereof. Previous actions and character of the defendant. I think you kind of resented some of the - - what the prosecutor was asking you. And I don't see that as a good character. I think you've got an attitude. Whether or not you might reasonably be expected to rehabilitate, yeah, you probably will be. But not through probation. And whether or not it would reasonably appear that you would abide by the terms of probation, you might or you might not. But I don't see that you would. Whether or not measures less restrictive than confinement have ever been used, none, because you don't have a record. And whether or not the sentence of full probation would unduly depreciate the seriousness of the offense. . . and I find that it would. Simply that you killed somebody - - it's not that you kill somebody so you got to go to jail. But you kill somebody after getting robbed and you wait three months. Not waiting but looking, seething, whatever caused it. I'm approving the verdict of the jury. And sentencing you to the Shelby County Correctional Center for four years and six months as a Range I standard offender.

In sum, the trial court denied probation, finding that although the defendant had no criminal record, confinement was necessary to avoid depreciating the seriousness of the offense and that the defendant was likely to rehabilitate, but not if given probation.

As the trial court pointed out, the defendant has no prior history of criminal conduct, and confinement is therefore not necessary to protect society from the defendant or because less restrictive measures have previously been applied. However, there is sufficient evidence in the record to support a denial of alternative sentencing based on the seriousness of the crime. The defendant admitted to carrying a weapon in lieu of reporting his concerns about the victim's threats to the police. He showed little hesitation in using that weapon and, by repeatedly firing shots toward

the victim in the surroundings of an apartment complex, endangered others' lives. Furthermore, while the defendant stated that he was sorry that the victim lost his life, he never acknowledged any culpability. We conclude that the denial of alternative sentencing was warranted.

## B. Length of Sentence

The defendant argues that the length of his sentence is excessive because the trial court erred in not considering applicable mitigating factors and in considering inapplicable enhancement factors. Before we address the defendant's argument that his sentence is excessive, we must first determine the length of the sentence imposed by the trial court. As noted above, the sentencing hearing transcript reflects that the trial court ordered that the defendant's sentence would be four years and six months. However, the judgment form states a sentence of four years only. This court has previously noted that when there is a discrepancy between what is reflected in the sentencing hearing transcript and what is on the judgment form, the transcript controls. State v. Miranda Sexton, No. E2006-01471-CCA-R3-CD, Hamblen County, slip op. at 8 (Tenn. Crim. App. Feb. 27, 2007); see also State v. Moore, 814 S.W.2d 381, 383 (Tenn. Crim. App. 1991) (stating that when there is a conflict between the court minutes and the transcript of the proceedings, the transcript controls). Therefore, we determine that the trial court sentenced the defendant to four years and six months.

The sentencing range for a Range I, standard offender convicted of a Class C felony is three to six years. See T.C.A. § 40-35-112(a)(3). Under the law applicable at the relevant time, three years was the presumptive sentence the trial court should have imposed unless enhancement factors were found. T.C.A. § 40-35-210(c) (2003). In sentencing the defendant to a term of four years and six months, the trial court found that no mitigating factors applied and that the following enhancement factors listed in Code section 40-35-114 did apply: (3) that the defendant was a leader in the commission of an offense involving two or more criminal actors and (11) that the defendant had no hesitation about committing the crime when the risk to human life was high. The court told the defendant that it found the latter factor was applicable "based on your prior statements after the robbery: 'When I find him, I'm going to kill him.' And you carried that out."

The defendant argues that the trial court erred in enhancing his sentence based on the determination that he was a leader in the commission of the offense. We agree. There was no evidence presented at trial indicating that the defendant planned the attack on the victim and encouraged Johnson to participate. See State v. Freeman, 943 S.W.2d 25, 30 (Tenn. Crim. App. 1996) (holding that trial court erred in applying enhancement factor that defendant was leader in the commission of the offense because there was no evidence that defendant planned the encounter with the victim or that he requested or prompted others to participate). Although the evidence showed that the defendant had a motive to kill the victim and that the defendant was the first to fire shots at the victim, these facts alone are not sufficient to establish that he led Johnson in the commission of the offense. See State v. Buckmeir, 902 S.W.2d 418, 423 (Tenn. Crim. App. 1995) (holding that trial court erred in applying the enhancement factor that defendant was the leader in the commission of the assault of the victim, where facts showing that defendant had sex with victim before informing codefendant that he could have sex with victim were not sufficient to enhance defendant's sentence

-16-

on this basis). The trial court erred in applying enhancement factor (3). However, we agree with the trial court's application of enhancement factor (11), as the defendant's actions in firing repeated shots at the victim while running through an apartment complex reflect that the defendant did not hesitate about committing the crime when the risk to human life was high.

The defendant also avers that the trial court erred in not applying the following mitigating factors, pursuant to Code section 40-35-113: (2) that the defendant acted under strong provocation; (3) that substantial grounds exist tending to excuse or justify the defendant's criminal conduct; and (11) that the defendant committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct. However, the defendant has not explained why these factors should apply. Regarding factor (2), we note that this factor does not automatically apply in voluntary manslaughter cases. See, e.g., State v. McKinzie Monroe Black, No. 01C01-9401-CC-00006, Robertson County, slip op. at 8 (Tenn. Crim. App. July 14, 1995). Furthermore, we see nothing in the record to suggest that the trial court erred in failing to apply mitigating factors.

Although we conclude that the trial court erroneously applied enhancement factor (3), this error does not necessitate a sentence modification. See State v. Hayes, 899 S.W.2d 175, 186 (Tenn. Crim. App. 1995) ("The mere number of existing enhancement factors is not relevant—the important consideration being the weight to be given each factor in light of its relevance to the defendant's personal circumstances and background and the circumstances surrounding his criminal conduct."). We conclude that the trial court did not err in imposing a sentence of four years and six months.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the defendant's conviction. However, because the sentence reflected in the judgment is inconsistent with the sentence stated in the sentencing hearing transcript, we remand the case for entry of a corrected judgment to reflect a sentence of four years and six months.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE

-17-